IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

FOREST GROVE SCHOOL DISTRICT,

                  Plaintiff,

    v.

STUDENT,

                  Defendant,

STUDENT,

                  Counter Claimant,

    v.

FOREST GROVE SCHOOL DISTRICT,

                  Counter Defendant.

Case No. 3:14-cv-00444-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff-Appellant-Counter Defendant Forest Grove School District ("the District") seeks

review of a December 18, 2013 Final Order by Administrative Law Judge Joe L. Allen ("the ALJ"

or "ALJ Allen") finding the District in violation of the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1401 et seq. Defendant-Appellee-Counter Claimant Student ("Student") cross-appeals, and asks the court to uphold the ALJ's Final Order and seeks an award of attorney fees and costs. For the reasons that follow, the court affirms in part and reverses in part the ALJ's Final Order.

*Procedural Background*

This is the second due process hearing between the parties. On December 6, 2011, Parents, on behalf of Student, filed a due process hearing request (DP 11-131) with the Oregon Department of Education. That hearing involved Student's 2009-2010, 2010-2011, and portions of the 2011-2012 academic years. Administrative Law Judge Jill Messecar ("ALJ Messecar") issued a Final Order in DP 11-131 on September 12, 2012. On October 12, 2012, the District appealed the Final Order in DP 11-131 to this Court (*Forest Grove School District v. Student*, Case No. 3:12-cv-01837-AC).

While the appeal of DP 11-131 was pending, Parents,[1] on behalf of Student, filed the present due process hearing request (DP 13-104) on March 5, 2013, and an amended due process complaint August 9, 2013. Beginning September 23, 2013, ALJ Allen held three days of hearings on DP 13-104, and issued a Final Order on December 18, 2013.

On March 18, 2014, the District filed an appeal of Final Order DP 13-104 (Case No. 3:14-cv-00444-AC, Compl., ECF No. 1-1, hereinafter "Final Order").

---

[1] The due process complaint was filed in the name of both Parents. The Transcript differentiates between mother and father as Parent 1 and Parent 2, however, only Parent 1 testified at the hearing and Parent 1 has been identified as Educational Surrogate for Student. (Ex. S62.) Thus, references in this Opinion and Order to Parent refer to Parent 1 where factually significant.

Simultaneously, Parents filed a separate Complaint and Petition for attorney fees, expenses, and costs in pursuing DP 13-104 (Case No. 3:14-cv-00445-AC, Compl., ECF No. 1). Parents also requested attorney fees and costs in this case. In an April 12, 2018 Opinion and Order, the court determined that attorney fees are not relevant to resolution of the merits in this case, and that attorneys fees would be resolved in Case No. 3:14-cv-00445 in due course. (Op. & Order 6, ECF No. 61.)

On June 9, 2014, the Court issued an Opinion and Order on DP 11-131, affirming in part and reversing in part the findings and legal conclusions reached by ALJ Messecar. (Op. & Order, Case No. 3:12-cv-01837, ECF No. 41, *available at, Forest Grove Sch. Dist. v. Student*, 2014 WL 2592654 (D. Or. June 9, 2014).) On June 30, 2014, Student appealed DP 11-131 to the Ninth Circuit. Meanwhile, the court entered a stay in this case (and Case No. 3:14-cv-00445-AC) pending Student's appeal of DP 11-131. On December 5, 2016, the Ninth Circuit affirmed this court's Opinion and Order concerning DP 11-131. *Forest Grove Sch. Dist. v. Student*, 665 F. App'x 612 (9th Cir. 2016).

*Factual Background of DP 13-104*

In the current DP 13-104, Student complains of the District's actions beginning December 6, 2011. Because there is some overlap of issues and facts with DP 11-131, the court discusses general background facts about Student as well as facts pertinent to DP 13-104 beginning in November 2011.

The District convened an IEP team meeting on November 3, 2011. (Ex. S8.)[2] After the meeting, Parents emailed the District copies of two reports; a report from Speech Language Pathologist Robert Buckendorf dated August 2011, and a report from child psychiatrist Ken Ensroth,

---

[2] Citations to Exhibits and Transcript are those contained in the conventionally filed Administrative Record. (Admin. R., ECF No. 65.)

M.D., dated October 2011. (Ex. D2.) The IEP team met again on November 14, 2011 to finalize revisions to Student's IEP. (Ex. S10.) The November 2011 IEP provided specially designed instruction in transition reading, writing, and transition math, and that Student receive one hour per week of speech and language therapy. *Forest Grove*, 2014 WL 2592654, at *7. The November 2011 IEP detailed certain supplementary aids, services, accommodations and modifications for Student, including: visual supports for classwork assignments and homework; modified tests and assignments in all general education classes; and copies of notes following adult prompts. Student also was to have essay questions modified on proficiency tests and test questions read aloud. *Id.* The November 2011 IEP team placed Student in a combination of special and general education classes with pull-out for tutorial services and speech and language services because it allowed Student to develop social skills in general education classes while maintaining access to special education instruction. *Id.*

Parent communicated frequently with Student's teachers, case manager, and other District staff. At some point, the District determined Parent's communication became excessive. On November 10, 2011, Kimberley Shearer, the District's Special Education Coordinator, sent an email to Parent indicating that the District was having difficulty responding to Parent's multiple requests and assessing which requests were necessary to the ongoing IEP process. (Ex. D27.) Ms. Shearer put in place a "communication protocol" to ensure effective communication. *Id.* Ms. Shearer requested that Parent summarize her concerns and consolidate them into a single, weekly email to be directed solely to Kathryn Taplin, Student's then case manager. *Id.* Ms. Shearer indicated that Ms. Taplin would open only the most recent email sent on Friday afternoons, and respond to Parent's

concerns that Friday. *Id.* At the hearing, Ms. Shearer testified that she had more communication with Parent than any other Parent. (Tr. 287-88.)

On December 6, 2011, Parents filed a due process hearing request (DP 11-131) challenging the November 2011 IEP. (Ex. S33.) On January 24, 2012, the District denied Parent's request for an instructional assistant in all of Student's classes because having an instructional assistant in every class was not in the November 2011 IEP. (Ex. S11.) At that time, Student did have an instructional assistant in a couple of her general education classes, including Biology and American Studies. (Ex. D17 at 3, Tr. 649, 1056-57.) On January 26, 2012, Parent emailed Forest Grove School District Superintendent Yvonne Curtis inquiring about the District's refusal to discuss Student's math class placement and discuss Student's upcoming semester schedule. (Ex. S12.)

On March 8, 2012, Parent emailed Ms. Taplin to request that notes from an instructional assistant be given to Student to take home to study, instead of being kept in a folder in Student's tutorial class. (Ex. S18.) Parent also indicated a preference that Student receive notes before class to follow along while being instructed. (Ex. S18.) At the hearing, Parent testified that Student's receipt of notes improved, but that Student was not receiving them 100 percent of the time. (Tr. 891-92.) Parent also testified that Student was not having her test questions read aloud, that the instructional assistant was not available to provide that service, and that the teacher refused to read Student the test questions aloud. (Tr. 975-76.)

Beginning April 16, 2012, ALJ Messecar convened a due process hearing on DP 11-131, which continued over the course of 12 days, concluding on June 29, 2012. On May 16, 2012, Parent emailed Ms. Taplin requesting information about Student's schedule for the following year, as well as inquiring about which teachers and courses would be appropriate for achieving Student's writing

goals, Student's entitlement to literary instruction, and services. (Ex. S20.) In response to Parent's request, Ms. Shearer, on behalf of the District, responded that they were in "stay put" as a result of ongoing due process hearing, and that the District would not normally be holding an IEP. (*Id.*) Ms. Shearer also indicated that the IEP team did need to meet to discuss whether Student qualified for Extended School Year ("ESY") services over the 2012 summer break. (*Id.*) Parent forwarded Ms. Shearer's response on May 17, 2012 to Ms. Taplin, requesting that the IEP team meeting discuss 2012 ESY services, Student's class scheduling, and transition services. (*Id.*) Parent also requested regression and recoupment data prior to the ESY IEP team meeting and Parent indicated a desire to discuss reading, writing, speech and math. *Id.* Parent refused to provide potential dates for the ESY meeting until receipt of the regression and recoupment data. (*Id.*)

On May 18, 2012, Ms. Shearer responded to Parent that a full IEP review would not occur at the upcoming meeting but needed to wait until the annual November 2012 meeting. (Ex. S21.) Ms. Shearer also stated that student schedules could not be discussed at the ESY team meeting because forecasting and bell schedules had not been completed, and could be discussed at a later date. (*Id.*) Ms. Shearer requested that all future communication and requests be directed through her. (Ex. S21 at 2.)

On May 20, 2012, Parent emailed Ms. Shearer concerning the ESY regression and recoupment data and questioning the District's refusal to hold an IEP meeting. (Ex. S21 at 1.) Ms. Shearer then instructed Parent to direct all future discussions about ESY and IEP meetings through legal counsel. (Ex. S21 at 1).

On May 31, 2012, the District scheduled an IEP team meeting for June 8, 2012. (Ex. S24.) The agenda for the meeting centered on Student's ESY eligibility for summer 2012. (Ex. S25.) At

the June 8, 2012 meeting, Parent wanted to discuss issues other than ESY, but the district refused. (Ex. S26.) The District explained the ESY criteria and presented the regression and recoupment data collected by Student's teachers over the 2011-2012 winter break. Parent disputed the regression and recoupment data because it was presented in summarized form. Parent requested the underlying data, and asked the District to use summer break data to consider ESY eligibility. (Ex. S26 at 4-5.) Parent also requested that the District compare the present levels set forth in the March 2011 and November 2011 IEP's to determine eligibility. (*Id.*) The District determined that based on the winter break data, Student did not qualify for ESY because there was not greater than 10 percent regression in loss of skills or behaviors. (Exs. 26 at 5-6; Ex. 27.)

On September 9, 2012 ALJ Messecar issued a Final Order, finding a number of procedural and substantive violations. In relevant part, ALJ Messecar determined that the District denied Parents the opportunity to meaningfully participate in Student's education and failed to provide Student a free and appropriate public education ("FAPE") in the 2011-2012 academic year. *Forest Grove*, 2014 WL 2592654, at \*9-10. Notably, ALJ Messecar made the following conclusions of law:

> 1. District denied Parents the opportunity to meaningfully participate in the Student's education during the 2009–2010, 2010–2011, and 2011–2012 academic years, in violation of IDEA and its implementing Oregon Revised Statutes (ORS and Oregon Administrative Rules (OARs); and
>
> 2. District failed to identify Student as a student with a disability in all areas of disability during the 2009–2010, 2010–2011 and 2011–2012 academic years, in violation of the IDEA . . .;
>
> 3. District failed to evaluate Student in all areas of suspected disability during the 2009–2010, 2010–2011 and 2011–2012 academic years, in violation fo the IDEA . . .;

4. District failed to provide Student with a free appropriate public education (FAPE) during the 2009–2010, 2010–2011 and 2011–2012 academic years, in violation of the IDEA . . .;

5. District provided an appropriate placement for Student during the 2009–2010, 2010–2011 and 2011–2012 academic years.

*Forest Grove*, 2014 WL 2592654, at *9-10. ALJ Messecar ordered that the District provide the following remedies:

> (1) a comprehensive evaluation to determine Student's present levels; (2) an IEP meeting to draft a new IEP based on the comprehensive evaluation; (3) "two hours of direct transitional reading instruction for every week of instruction Student should have received between September 2010 and December 6, 2012"; (4) two hours of transition math instruction for every school week between September 2010 and December 6, 2012; (5) sixty minutes of anxiety counseling per week until Student turns 21; (6) a driver's education course; (7) Specially designed instruction which employs "the learning techniques described in the 2005 and 2008 evaluations . . . and described by Mr. Larsen in the November 2011 IEP"; and (8) training for District staff on IDEA protocol for writing and implementing IEPs.

*Forest Grove*, 2014 WL 2592654, at *10.

Consistent with ALJ's Messecar's Final Order, on September 19, 2012, Student was scheduled for weekly counseling services with Teresa Mouw, the school Mental Health Specialist, on Tuesdays from 8:45 to 9:45 a.m. (Ex. S34.) On September 21, 2012, Parent was instructed to direct all her communications concerning the due process hearing and the ALJ's decision to the District's legal counsel. (Ex. S35.) On September 24, 2012, Parent sent an email to Ms. Shearer regarding changing Student's fall schedule to include life skills training. (Ex. S36.) Ms. Shearer responded that all communications regarding ALJ Messecar's order should be handled by legal counsel. (Ex. S36.)

On September 27, 2012, Parent again emailed Ms. Shearer regarding payment for obtaining an evaluation for Student. (Ex. S37.) That same day, the District's attorney asked Parent's attorney

to inform Parent not to contact the District staff about issues concerning the due process order, and that District staff had been instructed not to open Parent's emails, but instead to forward them to counsel. (Ex. S37.) Parent continued to send emails to District staff. On October 2, 2012, Ms. Shearer again instructed Parent to contact District counsel instead of instead staff. (Ex. S39.) On October 3, 2012, Parent again emailed Ms. Shearer (informing Shearer that "I do not take orders from your attorney"), and continued to inquire about matters covered in the due process order. (Ex. S39.) Later that day, the District's counsel informed Parent's attorney that due to the repeated and aggressive nature of Parent's emails, emails from Parent would be unopened, routed to "trash," and blocked. (Exs. S39, S42.) Thereafter, the District staff blocked Parent's email address. (Exs. S39, S42.)

On October 4, 2012, Parent's attorney responded to the District's attorney, indicating that Parent apologized for the aggressive tone of her October 3rd email. (Ex. S39.) Parent's attorney indicated that counsel would not be involved in day-to-day communications between the District and Parent, but would handle meetings and schedules, and matters related to the due process order. (Ex. S39.)

On October 2, 2012, Student was evaluated by Cynthia Arnold, Ph.D., for anxiety issues as part of the comprehensive independent education evaluation ("IEE") ordered by ALJ Messecar. (Ex. S38.) Dr. Arnold found that Student's academic skills are very impaired, and that her total achievement is extremely low. Dr. Arnold theorized that Student had received a lot of one-on-one help and remediation with her academic skills. However, Dr. Arnold indicated that Student's functional, novel use of information was quite limited. (Ex. S38 at 3.) Dr. Arnold diagnosed

Student with Mild Mental Retardation, and noted that her testing did not support a primary anxiety disorder. (*Id.*)

In early October 2012, Student had two incidents at school where she was crying in class. Ms. Mouw's October 9, 2012 progress notes from 8:45 a.m. reflect that Ms. Mouw attempted to engage Student in discussing why she was crying in Judith Bartoo's class; Student denied crying. (Ex. S41 at 1.) Ms. Mouw's progress notes from later that day at 1:10 p.m. indicate that she was asked by Ms. Taplin to meet again with Student because Student seemed confused, was repeating herself, and was having difficulty completing her work. (Ex. S41 at 2.) Student requested to return to class. (*Id.*) Parent discussed Student's behavior with two of her teachers, Ms. Bartoo and Jill Hertel *via* telephone on October 11, 2012. (Ex. S42 at 2.)

On October 11, 2012, Student met with Dr. Ensroth at which time Parent expressed concerns about Student's behavior seeming increasingly forgetful and confused. (Ex. S44.) Dr. Ensroth's progress notes reflect that Student was pleasant, repeated herself, and was forgetful. (*Id.*) Dr. Ensroth's progress notes also reflect that Parent was frustrated with the lack of communication from teachers, but that Parent was able to reach Student's teacher *via* telephone. (Ex. S44 at 1.) Dr. Ensroth diagnosed an anxiety disorder, and recommended further psychological evaluation to rule out a thought process disorder. (*Id.* at 2.)

On October 15, 2012, Dr. Ensroth wrote a letter indicating that he had recently seen Student, who showed signs of confusion, anxiety, and that without close monitoring, there was a risk of Student's symptoms worsening. (Ex. S46.) Dr. Ensroth noted Student's signs were not as severe as the year prior and he prescribed medication. (*Id.*) Dr. Ensroth recommended that school staff

monitor Student closely, have a counselor available to speak with Student, and that school staff have regular and open communication with Parent. (*Id.*)

On October 16, 2012, the District's attorney confirmed *via* email to Parent's attorney that the IEP team meeting would occur on November 13, 2012. (Ex. S 47, S48.) In that email, the District requested information pertinent to developing the new IEP, including Dr. Ensroth's letter and his treatment notes, and any other evaluations completed as part of the IEE orderd by ALJ Messecar so that proposed new present levels could be drafted and provided in advance of the November 13, 2012 meeting. (*Id.*) The District also advised that Parent was expected to follow the school's medication protocol for administering medications to Student, and that while a new communication protocol is established, Parent had permission to contact any high school administrator for any emergency involving Student. (*Id.*) On October 24, 2012, the District's attorney again contacted Parent's attorney about scheduling compensatory education, and indicated that Parent may contact any of Student's teachers regarding issues relating to the classroom and that Brad Bafaro, the Forest Grove Special Education Director, would handle any issues relating to special education. (Ex. S48 at 3.)

In an Occupational Therapy evaluation completed on October 24, 2012, Student's scores on fine motor testing and dexterity were in the low to below average range, yet showed that Student had improved since her previous testing. (Ex. S50.) Direct occupational therapy services were not recommended. (Exs. D6, S50.)

The IEP team met on November 13, 2012, to update Student's IEP. Parents and their attorney were present. The team had an opportunity to review the draft IEP prior to the meeting. (Ex. S51 at 2). The team discussed present level data in the areas reading, writing, and math, and

noted that Student's progress in language and communication had been slow. (*Id.* at 2-3.) Parents asked whether the concept of time was taught in a functional capacity, and whether Student's confusion "episodes" were isolated instances or should be included in the IEP. (Ex. S51 at 3.) Parents requested that Dr. Ensroth's recommendations be included in Student's present levels. (Ex. S51 at 3.) Parents expressed concern about Student's daily living skills, staying on task, and socialization. (Ex. S51 at 4.) The team drafted a post-secondary goal with Parents' input. (Ex. S51 at 5.) The team broadly discussed functional reading, math, and community based living skills and agreed to postpone a decision on the IEP until Parents could review those goals. (Ex. S51 at 5-6.)

The IEP team met again on November 27, 2012. At that meeting, the team discussed Student's present levels, and Parent expressed concern about Student's mental health. (Ex. S56 at 2.) Parent's attorney expressed a desire to have Occupational Therapy added into the IEP, and the team agreed to add any specific concerns into the accommodations portion of the IEP. (Ex. S56 at 3.) The team addressed Student's functional math goal and agreed to Parent's request to add as a baseline that Student does not understand the lapse of time. The team discussed Student's reading goals and that Student's baseline for vocabulary is zero percent. (Ex. S56 at 4.) With respect to the transition life skills of transportation and job applications, the team agreed to add as present level that Student has not demonstrated an ability to perform these activities independently. (Ex. S56 at 4.) The team discussed kitchen safety and work experience goals and whether those goals would be developed in the community or at school. (Ex. S56 at 5.) Parent inquired about Student's unit writing goal and expressed concern that they were not included in the draft IEP. (Ex. S56 at 5). Parent also asked that goal of self-advocacy and managing stress be added and a desire for Student to gain practical experience with those goals. (Ex. S56 at 5.) The team decided to implement the

transition goals at the semester break on January 7, 2013. (*Id.* at 6.) Parent inquired about the appropriate placement for Student in work experience. (*Id.*) The November 2012 IEP included specially designed instruction ("SDI") in functional reading. (Ex. S57 at 16.)

On January 18, 2013, Parent emailed Ms. Taplin with concerns about the November 2012 IEP. (Ex. S61.) Parent indicated that Student needed 4.5 credits to graduate, and therefore would not be graduating early. Thus, Parent expressed a desire for Student "to continue in academics throughout her transition years." (Ex. S61.) Parent requested that information about classes taught at the community transition house, and a list of businesses working with the District to provide transition skills. Parent also requested that Student's functional math goals be raised to include working with a calculator. (Ex. S61.) Parent indicated they wanted changes to Student's transition life skills goals, including that Student to use her iphone/ipad to track using the bus and schedule and eliminating kitchen safety goals. (Ex. S61.) Parent requested that Student return to Basic English to work on her reading and writing skills. (Ex. S61.) Parent asked for an IEP team meeting on February 4, 2013 to discuss Student's special education reading instruction. (Ex. S63.) Parent questioned the District's placement of Student in Treble Choir and New Careers, and requested that Student be placed in a special education New Careers class instead. (Ex. S63.)

Student turned 18 years of age on January 31, 2013, and Parent was named legal guardian and educational surrogate. (Exs. S62, S87.)

On February 8, 2013, the District's attorney responded to Parent's concerns, declining to hold an IEP meeting on February 4, 2013. The attorney indicated the transition goals spelled out in the November 2012 IEP had been in place for one month because the parties agreed to a January 7, 2013 implementation date, and the District believed the current IEP goals were appropriate. (Ex. S64 at

2.) Because of the volume of emails from Parent to District staff, the District's attorney advised Parent of the following protocol: (1) for day-to-day issues such as field trips, school pick-up, emergencies or health issues, Parent could continue to contact appropriate District staff and teachers; and (2) for issues relating to IEP changes, curriculum, and implementation, Parent should email once per week to Mr. Bafaro, and Mr. Bafaro would respond within three school days. (Ex. S64.)

On February 27, 2013, Parent emailed Superintendent Curtis to request a meeting to discuss Student's health and safety. (Ex. S68 at 2.) Dr. Curtis responded that she was unable to meet due to ongoing litigation. (Ex. S68 at 2.)

On March 4, 2013, Ms. Shearer informed Parent *via* email that they were scheduling an IEP team meeting for April 15, 2013, and that progress reports had been mailed. (Ex. S68.) On March 5, 2013, Parents requested a due process hearing in the instant action (DP 13-104).

On March 13, 2013, Ms. Shearer requested Parent's input for the agenda items. (Exs. S69.) Parents responded with a list of twelve agenda items, including, ESY, Student driver's license, transitional reading and writing, work experience, and compensatory education. (Exs. S70, S73 at 3.) On April 10, 2013, the District responded to Parents, indicating that the IEP team meeting was not a full IEP review, but would cover ESY services for the summer, Student's functional reading goal, and consideration of new outside reports from Parents. (Ex. S73 at 1.) The District also sent a prior written notice indicating that the primary purpose of the April 15, 2013 team meeting was to discuss ESY eligibility, and any significant new information since the November 2012 meeting. (Ex. S74.)

At the April 15, 2013 meeting, Parents requested that the IEP team revise the existing functional goals, add goals they believed were missing, and revise the transition goals to align with

Student's present levels. Parents presented a list of their concerns at the April 15 meeting, including reviewing the regression and recoupment data, how speech was being delivered, changing Student's post-secondary transition goal to college academics (from college recreational) and competitive employment, changing Student's placement to general education from transitional education in reading and writing. Parents requested that two paragraphs they claimed were unfairly removed from the November 2011 IEP regarding how Student processes auditory information be reinserted in the November 2012 IEP. (Ex. S79.) At the meeting, Parents also presented graph charts comparing Student's present levels from the November 2011 IEP with the November 2012 IEP and progress notes from February 2013. (Exs. S81-84.)

At the meeting, Parents noted that Student is meeting 100 percent of her functional math goals, and asked why Student continued to be placed in functional math. (Ex. S84 at 2.) Parents requested that Student be placed in a higher functioning community life skills class and wanted Student's goals to be more rigorous. (Ex. S84 at 3.) The team discussed that ESY data for work experience showed regression, and that Student was eligible for ESY in work experience. (Ex. S84 at 3.) Parents requested that Student's functional reading goal be revised and that Student be placed in academic reading and writing classes. (Ex. S84 at 4-6.) The team also discussed that Student was not independent in her transportation goal and Parents requested the goal be revised. (*Id.*) The team decided that the functional reading goal would be revised, and draft language would be sent to Parents, that social stories would be added to the modification/accommodations page, and that Student qualified for ESY summer services. The team heard multiple concerns from Parents. (Ex. S84 at 6.)

After the April 15, 2013 team meeting, Parent sent multiple emails continuing to express her disagreement that the IEP was not updated to reflect Parent's concerns about ESY, speech time specifics, the two statements about how Student best learns, a technology specific transition goal, and a nurse protocol. (Exs. S89, S90, S91, S92, S93.)

On April 18, 2013, Ms. Taplin completed a Teacher Questionnaire for Student's Social Security disability application in which she indicated that Student's current instructional level for reading and math were at the second grade level and written language was at the third grade level. (Ex. S72 at 7.) Ms. Taplin indicated that Student has a "serious problem" (rated a four out of five) in all areas of acquiring and using information. (Ex. S72 at 8.) In the area of attending to and completing tasks, Ms. Taplin noted more varied responses, with some rated a two (a "slight problem") and others a five (a "very serious problem"). Of note, Ms. Taplin indicated that Student has a very serious problem in ability to work "without distracting self or others" and that Student is constantly distracted by others and has difficulty focusing. (Ex. S72 at 9.)

On May 29, 2013, the District informed Parent that due to the continued disagreements, all future correspondence should be directed to the District's attorney. (Ex. S97.) On May 31, 2013, the District offered ESY services in three areas: work experience, reading, and speech/language. (Exs. S96, S98.) Parents continued to express that Student also qualified for ESY in the areas of math and writing. (Ex. S96.) On June 4, 2013, the District's attorney emailed Parent the summer schedules for Student's ESY and compensatory education. (Ex. S99.)

On August 9, 2013, Parents filed a First Amended Complaint in DP 13-104. (Answer, Ex.1, First Am. Compl., ECF No. 3-1.) ALJ Allen held three days of hearings on September 23-25, 2013.

After hearing the testimony and reviewing the exhibits submitted by the parties, ALJ Allen made the following conclusions of law:

> (1) the District denied the Student educational opportunities and denied Parents a meaningful opportunity to participate in Student's education from December 6, 2011 until the end of the school year, during the 2011-2012 academic year.
>
> (2) The District denied the Student educational opportunities and denied Parent a meaningful opportunity to participate in the Student's education during the 2012-2013 academic year.
>
> (3) The District failed to provide the Student a free appropriate public education during the 2011-2012 academic year.
>
> (4) The District failed to provide the Student a free appropriate public education during the 2012-2013 academic year.

(Final Order at 12.)  The ALJ ordered the District to "convene a facilitated IEP meeting to discuss all Parents' concerns" within 21 days of the order.  (Final Order at 31.)  With respect to the compensatory remedies ordered by ALJ Allen, the ALJ indicated the following:

> [t]he violations for the 2011-2012 academic year share a common nucleus of operative facts as those found determined by ALJ Messecar. The current due process claim simply picks up [ ] at the filing date of that due process complaint. Accordingly, an award of continuing compensatory education for the relevant period is appropriate. As such the District is hereby order[ed] to provide two hours each of direct transitional math and transitional reading instruction for every week of instruction Student should have received between December 7, 2011 and August 14, 2013.

(Final Order at 32.) Therefore, ALJ Allen ordered the District to "continue to provide compensatory education services *via* certified special education teacher with a high school endorsement, including transportation to and from such services, for the denial of FAPE in the 2011-2012 and 2012-2013 academic years." (Final Order at 31.) ALJ Allen also instructed the District to continue to "deliver SDI by employing learning techniques effective for Student" as ordered by ALJ Messecar. (Final

Order at 32.) And, because "Parents did not demonstrate a new or independent failure to properly evaluate Student," ALJ Allen ordered the District to provide District staff training for IEP development and evaluating Student consistent with ALJ Messecar's decision only. (Final Order at 32.)

The District appealed the ALJ's Final Order to this court on March 18, 2014. (Compl., ECF No. 1.)

On June 9, 2014, this court reversed in part and affirmed in part the conclusions of ALJ's Messecar's decision in DP 11-131. Concerning Parents' argument that the District denied them an opportunity to meaningfully participate by rejecting the various independent evaluations, this court partially agreed with the ALJ's findings. *Forest Grove*, 2014 WL 2592654, at *13. In this regard, the court affirmed ALJ Messecar's decision that the District violated the IDEA for failing to consider Ensroth's October 2011 and Buckendorf's August 2011 reports when drafting the November 2011 IEP. *Forest Grove*, 2014 WL 2592654, at *18. As relevant to this case, the court determined that the November 2011 IEP denied Student a FAPE by failing to address Student's anxiety. *Id.* at 35.

*Legal Standard*

The IDEA permits a party aggrieved by an ALJ's decision to file an administrative appeal in United States District Court. 20 U.S.C. § 1415(i)(2)(A). Judicial review in IDEA cases differs substantially from judicial review of other agency actions. *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.* ("*Antelope Valley*"), 858 F.3d 1189, 1194 (9th Cir. 2017). The court reviews the full administrative record as well as any additional evidence introduced by either party and must base its decision on a preponderance of the evidence, and "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The preponderance of the evidence standard empowers

courts to conduct a more detailed and independent analysis, but is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Hendrick Hudson Cent. School Dist. Bd. Educ. v. Rowley* ("*Rowley*"), 458 U.S. 176, 198 (1982). Complete *de novo* review is inappropriate. *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001).

The ALJ's decision is accorded "due weight" and the reviewing court must, at least, "consider the findings carefully[.]" *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.* ("*Napa Valley*"), 496 F.3d 932, 937 (9th Cir. 2007) (internal quotation marks omitted). The ALJ's findings must be "thorough and careful" to receive particular deference. *Antelope Valley*, 858 F.3d at 1194 & n.1. A court "treat[s] a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *Napa Valley*, 496 F.3d at 942-43. On review, the district court "must actually examine the record to determine whether it supports the ALJ's opinion." *Id.* Ultimately, the degree of deference due to the ALJ is largely "a matter for the discretion of the courts." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).

Lastly, at the hearing, as the party seeking relief at the administrative level, Student had the burden of proof in challenging the District's action. *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 819-20 (9th Cir. 2007). Before this court, the District has the burden of demonstrating the ALJ's decision should be reversed. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.* ("*Fresno Unified*"), 626 F.3d 431, 438 (9th Cir. 2010); *L.M. v. Capistrano Unified Sch. Dist.* ("*Capistrano*"), 556 F.3d 900, 909 (9th Cir. 2009).

*Discussion*

The IDEA provides federal grants to state and local educational agencies to assist in educating children with disabilities. *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). In enacting the IDEA, Congress sought "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A); *Antelope Valley*, 858 F.3d at 1195. "To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053-54 (9th Cir. 2012); *Endrew*, 137 S. Ct. at 994; *Amanda J.*, 267 F.3d at 891.

A free appropriate public education, or "FAPE" includes both "special education" and "related services," which must be provided in accordance with the child's "individualized education program" or IEP. *Endrew*, 137 S. Ct. at 994. Thus, the state must provide special education and related services in conformity with a child's individualized education program ("IEP"). *Id.*

> The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley*, 458 U.S. at 181.

*Endrew*, 137 S. Ct. at 994. The IEP identifies, among other things, "the child's 'present levels of academic achievement and functional performance,' establishes measurable annual goals, addresses

the services and accommodations to be provided to the child and whether the child will attend mainstream classes, and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress." *Anchorage*, 689 F.3d at 1054 (quoting 20 U.S.C. § 1414(d)(1)(A)); *Endrew*, 137 S. Ct. at 994. A complete IEP that is fully compliant with the IDEA must be in place at the beginning of each school year for each eligible child. *Anchorage*, 689 F.3d at 1054; 20 U.S.C. § 1414(d)(2)(A).

When parents and educators disagree about what a child's IEP should contain, parents may turn to dispute resolution procedures set forth in the IDEA. A challenge may be procedural or substantive. *Fresno Unified*, 626 F.3d at 432-33; *Grants Pass Sch. Dist. v. Student*, Case No. 1:14-cv-01115-PA, 2015 WL 1951749, at *2-3 (D. Or. Apr. 29, 2015). A procedural violation occurs when a state violates the IDEA's statutory or regulatory procedures in creating an IEP. A substantive violation occurs when a state offers an IEP that is not reasonably calculated to enable the child to receive a meaningful educational benefit. *Fresno Unified*, 626 F.3d at 432-33.

When analyzing whether an agency provided a student a FAPE, the court conducts a two-part inquiry. First, the court must consider whether the state complied with the procedures set forth in the Act. *Doug C. v. Hawaii, Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013) (internal quotation omitted). Second, the court must determine whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Id.* A state must meet both requirements to comply with the obligations of the IDEA. *Rowley*, 458 U.S. at 207. Ninth Circuit has held that "*Endrew* did not change, but rather simply clarified *Rowley*." *Antelope Valley,* 858 F.3d at 1200.

On appeal to this court, the District challenges many of ALJ Allen's factual findings as inaccurate or incomplete, and asks the court to reverse three conclusions of law: (1) the District

denied educational opportunities to Student and denied Parents the opportunity to meaningfully participate in Student's education from December 6, 2011 through the academic year ending in June 2012, and the entire academic year 2012-2013; (2) District failed to provide Student a FAPE during the 2011-2012 and the 2012-2013 academic years; and (3) the appropriate remedy is to convene a facilitated IEP team meeting to discuss Student's educational program, and provide reading and mathematics compensatory education. The District maintains that where ALJ Allen's Final Order relied upon ALJ Messecar's decision, his conclusions must be overturned because this court reversed many of those conclusions. Moreover, the District asserts that any remedies ordered by ALJ Allen have already been provided, and therefore, requiring any further remedies is unnecessary.

In response, Student contends that ALJ Allen's decision properly determined that the District engaged in procedural and substantive violations, and asks that the court affirm ALJ Allen's decision.

I.    Academic Year December 6, 2011 to 2012

    A.    *The District Denied Parents a Meaningful Opportunity to Participate in Student's Education from December 6, 2011 Through the 2012 Academic Year by Continuing to Rely on the November 2011 IEP*

        1.    standard

The District must comply with the procedural requirements of the IDEA. *Fresno Unified*, 626 F.3d at 451-52. Not all procedural violations result in the denial of a FAPE. A student is denied a FAPE "only when the procedural violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." *Id.* (internal quotations and citations omitted); *Capistrano*, 556 F.3d at 909; *W.G. v. Bd. of Trustees of Target*

*Range Sch. Dist. No. 23* ("*Target Range*"), 960 F.2d 1479, 1484 (9th Cir.1992), *superseded by statute on other grounds as stated in Napa Valley*, 496 F.3d at 938-39.

2.    analysis

In his Final Order, ALJ Allen concluded that the District's refusal to convene an IEP meeting during the remainder of the 2011-2012 school year resulted in a continuing procedural violation. (Final Order at 15.) ALJ Allen highlighted that ALJ Messecar concluded that the District denied Parents a meaningful opportunity to participate in developing the November 2011 IEP because the IEP team ignored Buckendorf's August 2011 report, and ignored Ensroth's October 2011 report. Thus, ALJ Allen concluded the District's refusal to hold another IEP team meeting was a continuing procedural violation from December 6, 2011 through the end of the academic year in June 2012. (Final Order at 15.) Likewise, ALJ Allen determined that the District's continued reliance on the faulty November 2011 IEP was a continuing substantive violation from December 6, 2011 through the end of the academic year in June 2012. (Final Order at 15-16, 22.)

The District argues that ALJ Allen's findings of fact and conclusions of law on this point are not entitled to deference because they rely on ALJ Messecar's flawed fact finding and analysis. The District contends it was not required to hold a new IEP meeting during the 2011-2012 school year for several reasons. First, Parents requested a due process hearing on December 6, 2011, triggering the "stay put" provision, and therefore, the District could not change Student's placement. The District highlights that ALJ Messecar conducted hearings on multiple days in April, May and June 2012, and issued a Final Order on DP 11-131 on September 12, 2012. According to the District, because of the pending due process hearing, and attendant stay put provision, they were not required to conduct another IEP meeting. Second, the District contends that it is required to conduct IEP's

annually, and therefore, it satisfied that requirement by conducting an IEP team meeting in November 2012. Third, the District argues that even if it should have conducted a meeting, its failure to do so did not result in a substantive violation. The District contends that ALJ Allen relied solely on ALJ Messecar's decision, which this court later overturned, and consequently, the court should overturn ALJ Allen's conclusion. Student responds that ALJ Allen correctly determined that the District's continued use of the November 2011 IEP resulted in a procedural and substantive violations of the IDEA. Student is correct.

Although this court overturned many of ALJ Messecar's findings, conclusions, and remedies, the court affirmed some as well. As Student indicates, this court determined that the District's failure to consider "the updated [2011] Ensroth and Buckendorf reports when drafting the November 2011 IEP" resulted in a procedural violation. *Forest Grove,* 2014 WL 2592654, at *18. Therefore, as ALJ Allen correctly determined, this procedural violation continued throughout the 2011 to 2012 academic year by refusing to hold an IEP team meeting to consider that information.

The court is not persuaded by the District's argument that due to the "stay put" provision, it was prohibited from holding an IEP meeting during the pendency of the underlying due process hearing. *See Anchorage,* 689 F.3d at 1056 ("the mere existence of the 'stay put' order did not excuse the [district] from its responsibility to have a statutorily compliant IEP in place at the beginning of each school year"); *J.G. ex rel. Jimenez v. Baldwin Park Unified Sch. Dist.,* 78 F. Supp. 3d 1268, 1287 (C.D. Cal. 2015) (holding stay put provision did not excuse school from having an up-to-date IEP in place). The District contends that under stay put, it is prohibited from changing a student's placement and thus it was not required to convene an IEP meeting. *See* OAR 581-015-2360(5)(a) (providing that "[d]uring the pendency of any due process hearing or judicial appeal, the

child must remain in the present placement" unless the parties agree otherwise). However, as ALJ Allen correctly observed, the District could have conducted an IEP meeting and considered the updated reports, thereby providing Parents with an opportunity to provide input and discuss possible amendments to the IEP, even if it determined changes to the IEP were unwarranted. *See Anchorage*, 689 F.3d at 1057 (holding that stay put did not prohibit district from considering updates to student's present levels, functional performance, and establishing corresponding goals and objectives). Here, the District's refusal to consider the updated reports under the guise of stay put continued to deny Parents an opportunity to meaningfully participate in Student's education from December 6, 2011 to the end of the academic year 2012.

The District's contention that it was not required to conduct an IEP team meeting before November 2012 to comport with its annual requirement likewise is unpersuasive. *See* 20 U.S.C. § 1414(d)(2)(A) (requiring an IEP to be in place at the start of each academic year). In order to accomplish its purpose, the IDEA requires educational agencies have each child's IEP in effect at the beginning of each school year. 20 U.S.C. § 1414(d)(2)(a). An education authority's failure to develop an IEP for a student prior to the beginning of a school year results in a violation of IDEA. *See A.V. ex rel. Vaz Antunes v. Lemon Grove Sch. Dist.*, Case No. 3:16-cv-0803-CAB-(BLM), 2017 WL 733424, at *13 (S.D. Cal. Feb. 24, 2017) (finding district's failure to have a valid IEP in place at start of school year denied student FAPE); *D.C. v. Dep't of Educ.*, 550 F. Supp. 2d 1238, 1250 (D. Haw. 2008) (district's failure to have a valid IEP in place at the beginning of the school year resulted in denial of FAPE) (citing *Gadsby v. Grasmick*, 109 F.3d 940, 950 (4th Cir. 1997)). Here, because the November 2011 IEP was procedurally defective, the District's continued reliance upon it fails to satisfy its obligation under the IDEA to have a fully compliant IEP in place at the start of each

academic year for every eligible child. *Anchorage*, 689 F.3d at 1056 (determining district's continued reliance on an outdated IEP violated IDEA). Therefore, the court affirms ALJ Allen's conclusion that the District's refusal to hold an IEP meeting from December 6, 2011 through the end of the academic year resulted in a violation.

Finally, the District contends that even if there was a procedural violation for failing to convene another IEP team meeting in the 2011-2012 academic year, the deficiency did not result in denial of FAPE. The District maintains that ALJ Allen did not undertake his own analysis of the November 2011 IEP, but instead relied on ALJ Messecar's ruling, which this court overturned.

ALJ Allen concluded that the District's continued reliance on the November 2011 IEP resulted in denial of FAPE based on ALJ Messecar's findings. As the District correctly highlights, the court overturned many of ALJ Messecar's substantive violations related to the November 2011 IEP. Accordingly, the court overturns ALJ Allen's substantive violations related to the November 2011 IEP that are premised on ALJ Messecar's findings and conclusions.

However, this court affirmed ALJ Messecar's conclusion that the elimination of the self-management curriculum regarding Student's anxiety from the November 2011 IEP resulted in a substantive violation of the IDEA. *Forest Grove*, 2104 WL 2592654, at *35. Therefore, the District's continued reliance on the November 2011 IEP through the remainder of the academic year 2012 resulted in denial of a FAPE. Whether, as the District notes, a remedy was requested or is appropriate, will be discussed below.

Accordingly, the court affirms ALJ Allen's conclusion that the District's reliance on the faulty November 2011 IEP denied Student a FAPE from December 6, 2011 through the academic year in June 2012.

B.     *The District's Email Communication Protocols Did Not Result in Procedural Violations*

1.     standard

Harmless procedural errors do not constitute a denial of FAPE. *Capistrano*, 556 F.3d at 909. The court may grant relief for a procedural violation only if the error results in the loss of an educational opportunity or "significantly restricted parental participation." *Id.* The IDEA procedural requirements impose on school districts a duty to conduct a "meaningful meeting with the appropriate parties" when formulating an IEP. *Target Range*, 960 F.2d at 1485; *see also* 34 C.F.R. § 300.513(a)(2); OAR 581-015-2190(1) (providing that school districts must provide parents with an opportunity to participate in meetings regarding the "identification, evaluation, IEP and educational placement" of the child). Yet, Parents are not entitled to unlimited communications concerning their child. *Forest Grove*, 2014 WL 2592654 at *13. "A school district need not involve parents in 'informal or unscheduled conversations involving school district personnel and conversations on issues such as teaching methodology, lesson plans, or coordination of service provision if those issues are not addressed in the child's IEP.'" *Id.* (quoting OAR 581-015-2190(4)). *See also D.A. v. Meridian Joint Sch. Dist. No. 2*, Case No. 1:12-cv-00426-CWD, 2014 WL 43639, at *8 (D. Id. Jan. 6, 2014) (noting parental participation "does not require districts to 'acquiesce' to parents"); *Student v. Silver Falls Sch. Dist.*, Case No. DP 13-113 at 26 (stating that Parents not entitled to notice and participation in routine day-to-day school matters) (attached at Pl.'s Reply Br., Ex. 2, ECF No. 63-2).

2.    analysis

As detailed at length above, at various times, due to the volume and tone of Parent's emails received by the District's staff, the District put in place various communication protocols. ALJ Allen concluded that the District imposed "unreasonable communication restrictions" that prevented Parents from contacting Student's general and special education teachers by instructing Parents to direct their emails to Ms. Taplin. (Final Order at 17.) The ALJ then noted that Ms. Taplin was unable to handle the volume of emails from Parents, and thus required Parents to direct their emails to Ms. Shearer. (Final Order at 17.) The ALJ indicated that Ms. Shearer ultimately became overwhelmed with Parents' emails and instructed Parents to communicate with the District's attorney. ALJ Allen then determined that "the District blocked Parent's ability to send emails to Student's teachers, instructional assistants, or other District personnel." ALJ Allen concluded that many of Parents' concerns regarding Student's health and education "went unaddressed." (Final Order at 17.)

The District contends that ALJ Allen's findings and conclusions that its email communication protocol deprived Parents of the opportunity to participate in the IEP process are not entitled to deference and should be reversed. The District argues that ALJ Allen's final order ignores facts demonstrating that Parents meaningfully participated and provided input into developing the IEP's and other relevant educational decisions. Additionally, the District contends that Parents are not entitled to unlimited communication on every matter, but rather are entitled only to meaningful participation in the IEP formulation process.

The court concludes that ALJ Allen's decision concerning the District's communication protocols is neither thorough nor careful, and accords this portion of the decision little deference.

Additionally, the ALJ's conclusions of law regarding the communication protocols are entitled to little deference. Here, the ALJ erroneously concluded that the District blocked Parents' emails during the 2011-2012 academic year, contrary to evidence in the record. Moreover, the ALJ's legal conclusion fails to consider what impact the communication protocols had on Parent's ability to participate in the IEP formation process. Furthermore, the ALJ does not analyze or identify what information or concerns went unaddressed.

The record before the court reflects that the District instituted a communication protocol on November 10, 2011, several days after the November 3, 2011 IEP team meeting and several days before the November 14, 2011 IEP team meeting at which the November 2011 IEP was finalized. (Ex. S106.) In that protocol, Parent was to direct all communication with teachers, the District, and school staff through a single person, Kathryn Taplin, Student's case manager. (Ex. S106). To be sure, Parents were instructed to limit their emails to each Friday, and that Ms. Taplin would respond on Friday to Parents' concerns. (Ex. S106.). Moreover, at that time, Parents were represented by counsel, and Parents were aware of the November 14, 2011 IEP meeting and attended with their attorney. (*See* Ex. S8 at 3.) The November 14, 2011 IEP team meeting minutes indicate that Parents fully participated, asked questions, voiced concerns, and accommodations were discussed. (Ex. S10.)

As detailed at length above, the record shows that Parents continued to communicate *via* email with Ms. Taplin throughout most of the 2011-2012 academic school year. On May 18, 2012 Ms. Shearer responded to Parent's email requests, indicating that all future communication should go through her. (Ex. S21 at 2.) This email is consistent with Ms. Shearer's hearing testimony that Parent sent numerous emails to several staff members requesting information. (Tr. 284.) Ms.

Shearer testified that staff were receiving a large volume of emails, the tone was terse and intimidating, and that the District decided to route all communication through Ms. Shearer. (Tr. 285-86.) Ms. Shearer further testified that Parent's emails became excessive, and often related to the IEP under review and the attendant due process hearing, and that staff was not comfortable responding to those issues; therefore, communications were directed to legal counsel beginning May 20, 2012. (Ex. S21 at 1, Tr. 287-89.) As the District indicated, the communication protocol was required at least in part to separate out requests that might require a legal response in light of the ongoing due process proceeding.

ALJ Allen cites no authority for his conclusion that routing communications with Parent through its attorneys automatically results in an IDEA violation. (Final Order at 17.) Moreover, at all times when the email protocol was in place, Parents' access to school staff by telephone and in person was maintained. (Tr. 503.)

For example, on June 8, 2012, there was an IEP team meeting to discuss Student's eligibility for ESY services in the summer of 2012. Parents, along with their attorney, fully participated in that meeting, sent documents to the District's legal counsel in advance, and expressed concerns at the June 8, 2012 meeting. Although ALJ Allen stated that Parent's concerns about the Student's health and education "went unaddressed by the District," none of those specific concerns is identified or linked to the email communication protocol in the Final Order or in Parent's briefing to this court.

Thus, the court concludes that the communication protocol established on November 10, 2011 continuing through the 2011-2012 academic year did not "seriously infringe" on Parents' opportunity to participate in the formulation of the November 2011 IEP, or the June ESY 2012 determination. *See Cupertino Union Sch. Dist. v. K.A.*, 75 F. Supp. 3d 1088, 1101 (N.D. Cal. 2014)

(finding parents' refusal to participate in IEP formulation causing district to hold IEP meeting in parent's absence did not seriously infringe on parents' opportunity to participate); *N.R. ex rel. B.R. v. San Ramon Valley Unified Sch. Dist.*, Case No. C 06-1987 MHP, 2007 WL 216323, at *12 (N.D. Cal. Jan. 25, 2007) (finding lack of parental involvement in formulating IEP and ESY was result of parents' decision to stop cooperating, and district "should not be held accountable for parents' lack of cooperation"). The ALJ's decision on this issue is reversed.

    *C.    The District's Denial of ESY in Summer 2012 Did Not Result in FAPE*

    1.    ESY services eligibility standard

The IDEA does not explicitly require extended school year ("ESY") services. Instead, each public agency is required to "ensure that extended school year services are available as necessary to provide FAPE" and the child's IEP team determines on an individualized basis that it is necessary for FAPE. 34 C.F.R. § 300.106(a)(1)-(2). The federal regulation does not specify factors for consideration in determining ESY eligibility. *N.B. ex rel. C.B. v. Hellgate Elementary Sch. Dist. ex rel. Bd. of Dirs., Missoula Cty., Montana* ("*Hellgate*"), 541 F.3d 1202, 1211 (9th Cir. 2008). "'ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months.'" *Hellgate*, 541 F.3d at 1211 (quoting *MM ex rel. DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 537-38 (4th Cir. 2002)). Providing ESY services "is the exception and not the rule" and a claimant seeking ESY services must show that ESY is "'necessary to permit the child to benefit from his instruction.'" *Grants Pass*, 2015 WL 1951749, at *7 (quoting *Hellgate*, 541 F.3d at 1212).

In Oregon, ESY services are provided for the "maintenance of the child's learning skills or behavior, not the teaching of new skills or behavior." OAR 581-015-2065(4); *Grants Pass*, 2015 WL 1951749, at *7. The Oregon regulations require that regression and recoupment be considered when making an ESY determination. *Grants Pass*, 2015 WL 1951749 at *8. Criteria must include regression and recoupment time based on documented evidence or, if no documented evidence, on predictions according to the professional judgment of the [IEP] team." OAR 581-015-2065(5). "Regression" is defined as "significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services." OAR 581-015-2065(6)(a). "Recoupment" is "the recovery of skills or behaviors specified on the IEP to a level demonstrated before the interruption of services." OAR 581-015-2065(6)(b). Under the District's policy, a student must show greater than ten percent regression to be eligible for ESY services. Student does not challenge the District's ESY criteria in this action.

"An 'appropriate' public education does not mean the absolute best or 'potential-maximizing' education for the individual child." *Gregory K.*, 811 F.2d at 1314. Rather, states must provide a "basic floor of opportunity" that is "individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational authorities in cooperation with the parents or guardians of the child." *Id.* at 207. "[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208; *see also Fresno Unified*, 626 F.3d at 450 ("This vagueness [in the IDEA mandate] reflects Congress' clear intent to leave educational policy making to state and

local education officials."). Collection and analysis of educational data, such as regression and recoupment data, is a matter of educational policy and methodology. *See Virginia S. v. Dep't of Educ. Hawaii*, Civil No. 06-00128 JMS/LEK, 2007 WL 80814, at *12 (D. Haw. Jan. 8, 2007) ("Questions of ESY eligibility criteria and methodology are classic examples of technical questions of educational policy.").

### 2. ESY 2012 determination

The District scheduled an IEP team meeting on June 8, 2012 to discuss Student's eligibility for ESY services in the summer of 2012. (Ex. S26, IEP Meeting Minutes 6/8/12.) At the time, the District refused to discuss other agenda items (scheduling and transition services) proposed by Parent. (Ex. S20 & S21.) At the meeting, the District explained that to be eligible for ESY services, under District policy, the student must show greater than ten percent regression over a break to qualify for ESY. (Ex. S26, Meeting Minutes.) The District used pre-break data information as the baseline, and post-break monitoring over a two week period to assess whether the Student has been able to recoup the skills or behaviors lost. If there is greater than ten percent regression, the child may benefit from ESY services. (Final Order at 19-20.)

At the meeting, the District presented regression and recoupment evidence based on assessments of Student in the areas of language, transition reading, and transition math. The assessments were completed one month before winter break and two weeks after winter break, and were summarized and entered into a worksheet that tracked Student's IEP goals and objectives. (Ex. S23 at 4-6; Ex. S27 at 11-13.) Parent proposed that the District consider Student's regression and recoupment by comparing Student's present levels detailed in the March 2011 IEP with the present levels in the November 2011 IEP. According to Parent, that comparison showed declining skills.

Parent also expressed frustration that Student must qualify for ESY because Student is reading at the third grade level as a junior. (Ex. S26 at 5.)

In the Final Order, ALJ Allen concluded that the District denied Parent a meaningful opportunity to participate in Student's education by refusing to consider Parent's regression and recoupment data, and denied Student educational opportunities in the form of summer 2012 ESY services in the areas of transition reading, transition writing, and transition math. (Final Order at 19-20.)

The District contends that the ALJ erred in determining that it was required to rely upon Parents' preferred regression and recoupment data citing *Grants Pass,* 2015 WL at 1951749, at *9-10. In *Grants Pass*, the district court determined that the school district was not required to utilize the parents' preferred method of collecting regression and recoupment data, noting that "[c]ollection and analysis of educational data, such as regression/recoupment data, is a matter of educational policy and methodology." *Id.* at 9.

The ALJ's analysis on this point is not entitled to deference. ALJ Allen found that Parent "presented evidence" that Student's skills had fallen by comparing the present levels in the March 2011 IEP to the present levels in the November 2011 IEP, which necessarily incorporated a summer break. (Final Order at 9.) The ALJ also found that Student's June 2012 progress notes failed to track Student's annual goals ("AG's") or short term objectives ("STO's") set out in the November 2011 IEP. The court disagrees for several reasons.

First, contrary to the ALJ's fact finding, Parent did not present any documented regression and recoupment evidence for the team's consideration at the June 8, 2012 team meeting. (Ex. S26.) At the meeting, Parent expressed frustration that Student's goals were declining and complained that

the regression/recoupment data should be calculated differently, but Parent did not submit documented evidence at the meeting for the District to consider.[3] (See Ex. S26 at 4-5.) At the due process hearing, Parent testified that she wanted the regression/recoupment data to be collected over the summer break as a "best practice," and disagreed with the District's policy of collecting regression/recoupment data over winter and spring breaks. (Tr. at 892-93.) Parent also testified that she requested but did not receive the underlying information the percentages in the summer 2012 ESY worksheet. (Ex. S27 at 11-13.) However, the collection and calculation of regression and recoupment data is a matter of educational policy and methodology, and absent tangible data for the District's consideration, the District was not obligated to consider Parent's request to calculate regression a different way. *See Grants Pass*, 2015 WL 195749, at *10 (concluding district was not required to rely on ESY eligibility standards preferred proffered by parent and student's experts); *Virginia S.*, 2007 WL 80814, at *12-13 (finding that absent contrary evidence, court would not second-guess IEP team's decision that student not eligible for ESY services).

Second, the decline in annual goals does not necessarily mean that Student's declining skills were caused by regression over the summer. As this court determined in the previous proceeding:

> Student's AGs and STOs are less ambitious with each IEP, Student's academic focus changed from year-to-year. The District explained at oral argument that between May 2009 and November 2011, the focus of Student's reading curriculum shifted from simple reading skills to reading comprehension and later to drawing inferences from a reading passage. Student's 'declining reading level' as indicated in her AGs and STOs from year to year merely reflects the fact that Student's reading abilities are lower as the complexity of the reading task increases.

_____

[3] Parent did prepare and submit specific evidence regarding regression/recoupment to the District at an April 15, 2013 ESY IEP meeting. (Exs. S81-S83.)

*Forest Grove*, 2014 WL 2592654, at *35. Indeed, as discussed at length in the prior action, Student's IEP's were revised to add transition goals, which included changing Student's reading and math classes to functional life skills to best aid Student to live more independently. *Forest Grove*, 2014 WL 2592654, at *30. Therefore, a comparison of March 2011 IEP to November 2011 IEP goals may not necessarily yield accurate regression data.

Third, unlike the ALJ, the court finds that the February and June 2012 progress notes tracked the November 2011 IEP AG's and STO's, and support the District's position that Student did not qualify for ESY services. The June 2012 Progress Notes for Transition reading indicate that in February 2012, Student was reading second grade text and answering concrete comprehension questions with 90 percent accuracy – clearly satisfying that short term objective. (Ex. S30.) Additionally, the June 2012 Progress Note indicated Student was reading second grade text with 100 percent comprehension, and at third grade level and answering inferential and concrete questions with 90 percent accuracy. (*Id.*) Thus, ALJ Allen's finding that the June Progress Notes failed to correspond to the November 2011 IEP is simply not supported by the evidence presented. (FO Finding 32 at 9.)

The court concludes that the ALJ erred in requiring the District to utilize Parents' preferred method of calculating regression. Therefore, the court finds by a preponderance of evidence that the IEP team properly considered the 2011-2012 winter break data in making their determination that Student was not eligible for ESY services in the summer of 2012. Accordingly, the court reverses the ALJ's conclusion that the District denied Student a FAPE for failing to provide ESY services in the summer 2012.

### D. Failure to Implement All Accommodations in November 2011 IEP Was Not Material

#### 1. standard

The Ninth Circuit has determined that "there is no statutory requirement of perfect adherence to the IEP," thus "minor implementation failures" are insufficient to show an IDEA violation. *Van Duyn,* 502 F.3d at 821. "A material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." *Id.* at 822. The "materiality standard does not require that the child suffer demonstrable educational harm in order to prevail. However, the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided." *Id.*

#### 2. November 2011 IEP Accommodations

The November 2011 IEP required that Student would receive modified tests and assignments in all general education classes, that Student could request copies of notes following an adult prompt, that essay questions would be modified on proficiency tests in all classes, and that test questions would be read aloud on all proficiency tests in general education classes. (Ex. S9 at 3-4.)

In the Final Order, ALJ Allen found that many of Student's tests and assignments in the 2011-2012 academic year were not modified, that Student only sporadically received notes at best, and that Student rarely received prompting to request notes. (Final Order at 25.) ALJ Allen concluded that the discrepancies were "material." (*Id.*) ALJ Allen relied upon testimony from Ms. Shearer who indicated that Student was able to complete the work without the accommodations, and that therefore, they were not required to provide it. (*Id.*) ALJ Allen also concluded that the refusal to provide the accommodations provided in the IEP resulted in a unilateral IEP change, and thus a violation.

On review to this court, the District contends that ALJ Allen's determination is not entitled to deference because ALJ Allen failed to undertake a materiality analysis, and instead offered conclusions unsupported by the record. According to the District, Student did not show any decreased performance demonstrating that the minor shortfall in accommodations and modifications resulted in material failures to implement the November 2011 IEP. The court agrees.

In the Final Order, although ALJ Allen properly cited controlling case law, he failed to conduct any analysis as to how any failure to provide notes, testing modifications, or other accommodations was material. The ALJ did not attempt to discuss how the District's alleged shortfalls may have impacted Student's progress toward any identified goal in the IEP. Therefore, ALJ's reasoning on this point is not careful or thorough, and is not entitled to deference.

Here, with respect to Ms. Taplin's testimony concerning accommodations, the ALJ mischaracterizes her testimony. As Ms. Taplin testified at the hearing, not every assignment required modification; if Student was capable of completing the assignment without modification, Student would be encouraged, or "pushed" to do so independently, as Parents had requested. (Tr. 596.) The unmodified assignment about which Ms. Taplin testified required Student to complete her name, what school she attended, as well as identify strengths and accomplishments with blank spaces for single word responses. (Ex. S112.) Ms. Taplin testified that Student was clearly capable of completing the assignment without modification, and thus none was provided. (Tr. 596-97.) Additionally, Ms. Taplin further testified that when modifications became necessary for Student, they were provided. (Tr. at 596-97.) Ms. Taplin further testified that she worked with Student's American History teacher to provide modified tests. (Tr. 563-64.)

Indeed, Jessica McRobert, Student's instructional assistant for American History, testified that she took notes during class and worked with the teacher to modify tests and assignments. (Tr. 563-64, 651-54.) Charlotte Denis, Student's instructional assistant for Biology, testified that Student was utilizing a fifth grade biology textbook to track the tenth grade curriculum, and that she worked with the teacher to modify Student's homework, assignments, and tests for that course. (Tr. 1058-60.)

Additionally, Mr. Bafaro testified that if a student requiring accommodations or modifications could complete an assignment or test without either, the accommodations or modifications would not be provided as a "best practice." (Tr. 723-24.) Furthermore, the record reflects that Student was given classroom notes and powerpoint slides, and that the notes were being kept in Student's tutorial class to assist with completing homework. (Ex. S19.) On March 8, 2012, Parent requested *via* email that the notes be given to Student to bring home in order to study for tests. (Ex. S19). At the hearing, Parent testified that after sending the March 8, 2012 email, Student began receiving notes, but not 100 percent of the time. (Tr. 891-92.) Parent also testified that Student was not read a Health test aloud on one occasion and in American Studies on one occasion. (Tr. 975-76.) However, there was no evidence demonstrating that Student was not read tests aloud on a regular basis. The court notes that the November 2011 IEP does not specify that Student's notes be sent home for Student to study, only that notes be provided and tests be modified. (Ex. S9 at 2-3.)

The ALJ also made no effort to assess how the District's shortfalls amounted to more than a minor discrepancy. The District contends that Student received all passing grades in academic year 2011-2012, and received eight credits toward graduation, thus alleged shortfalls amount to minor discrepancies, and not material failures. (Ex. S104, S27.) To establish a material failure does not

require that Student suffer demonstrable educational harm, but here the ALJ made no findings on materiality and offered instead bare conclusions. In the Final Order, the ALJ does not identify any goals or objectives toward which Student failed to make progress that could even conceivably be the result of the District's failure to provide accommodations and modifications on tests and homework assignments, or failure to provide lecture notes.

The ALJ did not discuss, nor can the court find, any evidence demonstrating that the District's failure to provide notes, assignments or testing accommodations and modifications was material. The IEP did not require that the notes be sent home daily, and the evidence showed that Student was receiving them, but that they were being kept at school. Additionally, the ALJ ignored testimony from Student's instructional assistants about accommodations and modifications they provided to Student on a regular basis. Moreover, Student received a modified "A" in her Introduction to Horticulture, the one class that Parent asserted Student did not receive notes for the entire 2012 to 2013 academic year. (Tr. 973-74; Ex. S104.) The court finds by a preponderance of evidence that the District's failure to provide these specific modifications and accommodations with 100 percent accuracy was not material. Therefore, the court concludes the ALJ erred in concluding that the District denied Student a FAPE for failing to implement the November 2011 and November 2012 IEP's. *See Van Duyn*, 502 F.3d at 823; *L.M.H. v. Arizona Dep't of Educ.*, No. CV-14-02212-PHX-JJT, 2016 WL 3910940, at \*8 (D. Ariz. July 19, 2016) (finding failure to collect progress data was not material).

II.     Academic Year 2012-2013

    A.     *Continued Reliance on November 2011 IEP from September 2012 to November 2012*
         *Did Not Result in FAPE*

ALJ Allen concluded that the District continued to rely upon the faulty November 2011 IEP until the November 2012 IEP was implemented in January 2013. In that regard, ALJ Allen concluded that "the unresolved violations addressed by ALJ Messecar constitute continuing violations." (Final Order at 14.) As discussed above, to the extent that the District failed to consider the 2011 Ensroth and Buckendorf reports until November 13, 2012, the District continued to engage in a procedural violation. However, the court disagrees that the District continued to engage in a substantive violation. As noted above, the only portion of ALJ Messecar's decision upheld by this court and relevant to the present action pertains to Student's management of her anxiety. The record reveals that in beginning in September 2012, the District offered Student counseling during which Student worked on managing her anxiety. Student's counseling sessions continued through the entire period at issue, and in fact, were later deemed by this court as unnecessary. *Forest Grove*, 2014 WL 2592654, at *37. Additionally, Dr. Arnold's October 2, 2012 independent educational evaluation opined that testing did not support an anxiety disorder. Based on this preponderance of evidence, the court concludes that Student was not denied a FAPE in academic year 2012-2013.

Accordingly, the court affirms ALJ Allen's conclusion that the District's procedural violation continued from September 2012 through November 14, 2012 when it convened an IEP team meeting to discuss Ensroth and Buckendorf's reports. However, the court reverses ALJ Allen's decision that the District engaged in a continuing substantive violation from September 2012 through November 13, 2012.

*B.      Email Communication Protocol Did Not Seriously Infringe Parents' Participation*

In the Final Order, ALJ Allen concluded that in academic year 2013-2013, the District "impermissibly restricted and then prohibited Parent's ability to communicate with District personnel regarding Student's education and health." (Final Order at 25.) As with the 2011-2012 email communication protocol, the ALJ's findings and conclusions are neither accurate nor thorough, and are not entitled to deference. ALJ Allen fails to discuss any facts to support his conclusion that Parent was prevented from communicating any information about Student's health. Moreover, the ALJ undertakes no analysis as to how the email protocol differed from the previous year's or how it seriously infringed of Parent's opportunity to participate in the IEP formation process. *Capistrano*, 556 F.3d at 909 (holding that procedural inadequacies must significantly restrict parents' participation to deny FAPE). Therefore, because ALJ Allen's decision on this point is neither careful nor thorough, it is not entitled to deference.

The record shows that on September 9, 2012, ALJ Messecar issued the decision in DP 11-131. On September 21, 2012, Parents were instructed to direct all communications regarding the due process hearing and ALJ Messecar's decision through the District's counsel. (Exs. S35, S36.) Between September 24 and October 3, 2012, Parent sent multiple terse and aggressive emails to District staff, many combining issues concerning day-to-day issues along with the remedies required by ALJ Messecar. The District's attorney looked to Parent's attorney for assistance with the situation, but a communication breakdown ensued, and the District blocked Parent's email from its server on October 3, 2012. (Exs. 36, 37, 39, 42.) On October 24, 2012, the District's attorney informed Parent's attorney that Parent could contact any of Student's teachers concerning classroom issues, and Mr. Bafaro with other special education issues. In February 2013, the District's attorney

again had concerns about the volume of Parent's emails and instructed Parent to limit her contact for day-to-day issues to appropriate District staff, and issues relating to IEP changes, curriculum and their implementation to Mr. Bafaro once per week, who would respond within three days. Thus, contrary to ALJ Allen's suggestion, Parent's email was not blocked for the entire 2012-2013 academic year.

Also, contrary to ALJ Allen's suggestion, it is clear that Parent continued to communicate with the District about Student's IEP throughout the November 2012 IEP formulation process. The District's attorney continued to work with Parent's attorney to gather information pertinent to the November 2012 IEP beforehand, and drafting present levels in advance of the November 2013 meeting. Indeed, Parents were present at the November 13, 2012 meeting, fully participated in that meeting, and the team allowed another IEP meeting for Parents to review the newly proposed goals. Parents and their attorney were present at the November 27, 2012 IEP team meeting, fully participated, made suggested changes, and some of Parent's concerns were included in the IEP. And, Parents and their attorney participated in the April 15, 2013 ESY team meeting. Parents attended the meeting, submitted graphs for the team's consideration, spoke at length at the team meeting, and followed up *via* email after the meeting concluded. Based on Parents' input, additional ESY services were provided in summer 2013. To be sure, Parent had no difficulty advocating for Student despite the email protocol.

Neither ALJ Allen nor Parents in their briefing to this court identify what specific "health" information Parent was prevented from providing to the District because of the email communication protocol. The court presumes ALJ Allen and Parents refer to issues in early October 2012 at a time when Parent's emails were blocked by the District. Having carefully reviewed the record, the court

concludes that even *assuming arguendo* that these incidents could pertain to the IEP formulation process, Student was not denied a FAPE.

Here, the record shows that on October 9, 2012, Student was crying in class. That morning, Student met with Ms. Mouw, her counselor, who attempted to engage with Student to discover why Student was crying; Student denied crying. (Ex. S41 at 1.) Later that day, Ms. Mouw again met with Student because Ms. Taplin indicated that Student seemed confused. (Ex. S41 at 2.) Student requested to return to class. The record further reveals that on October 11, 2012, Parent called Student's teachers to discuss the incidents. (Ex. S42 at at 2.) Also, on October 11, 2012, Parent took Student to Dr. Ensroth for evaluation, and Parent expressed frustration with the lack of communication from teachers, but acknowledged she was able to reach them by telephone. (Ex. S46.). On October 15, 2012, Dr. Ensroth wrote a letter indicating that Student was experiencing some anxiety and confusion and that he was prescribing medication. (Ex. S46.)

The court concludes that based on a preponderance of the evidence, the District's email communication protocol did not result in a FAPE. As noted above, at all times Parent's access to school staff by telephone and in person was maintained, and Parent called Student's teachers to discuss the October incidents. Additionally, on the day of the incident, Student met with her counselor twice and it is clear that Student's case manager was aware of Student's behavior and monitored Student throughout the day. The record shows that Dr. Ensroth's evaluation and recommendations were discussed at the November 27, 2012 IEP team meeting, as were Parent's concerns about Student's mental health. Dr. Ensroth's recommendations included having staff monitor Student closely and having a counselor available for Student, actions the District was already undertaking. Indeed, the November 27, 2012 IEP team meeting minutes reflect that the

episode with Student crying was added into Student's present levels. (Ex. S56 at 2.) The team disagreed with Parent's characterization of Student as "psychotic" and indicated as much in the IEP. However, the record belies Parent's contention that Student's mental health issues went unaddressed by the District. The email protocol did not seriously infringe Parent's ability to participate and did not deny Student a FAPE. "Maximum parental participation is not the standard under the IDEA; rather, the standard is meaningful participation." *Z.F. v. Ripon Unified Sch. Dist.*, No. 2:11-cv-02741-KJM-GGH, 2013 WL 127662, at *8 (E.D. Cal. Jan. 9, 2013) (holding that parents had meaningful participation in formulation of students IEP formulation). The ALJ's determination on this issue is reversed.

### C.   District Did Not Deny Parents Opportunity to Participate at April 15, 2013 Team Meeting by Limiting Agenda

#### 1.   standards

"Parental participation in the IEP and educational placement process is critical to the organization of IDEA." *Doug C.*, 720 F.3d at 1043. Procedural inadequacies that seriously infringe the parents' opportunity to participate in the IEP formulation process result in the denial of a FAPE. *Id.* However, harmless procedural errors do not constitute a denial of a FAPE. *Capistrano*, 556 F.3d at 909.

School districts must provide ESY if the IEP team determines that ESY is necessary for provision of FAPE. *Hellgate*, 541 F.3d at 211; 34 C.F.R. § 300.106(a)(2). An IEP adequately provides a FAPE if it is reasonably calculated to provide a child with a meaningful educational benefit at the time it was developed. *Fresno Unified*, 626 F.3d at 432; *Grants Pass*, 2015 Wl 1951749 at *9.

2.      April 15, 2013 Parents' agenda items

In the Final Order, ALJ Allen concluded that the District's limitation of the April 15, 2013 IEP team meeting agenda to ESY eligibility, revision of Student's functional reading goal, and consideration of any new outside reports denied Parent a meaningful opportunity to participate and denied Student educational opportunities ESY Summer 2013 in the areas of transition reading, transition writing, and transition math. (Final Order at 30.) ALJ Allen determined that the District's refusal to consider additional agenda items submitted by Parent was a procedural violation of the IDEA, and that Parent's rights to meaningful participation extend to all IEP team meetings, not simply annual IEP reviews. (Final Order at 30.)

The District contends that the April 15, 2013 team meeting was not an annual IEP meeting, and therefore it legitimately limited the agenda to items not previously decided, or new information indicating the November 2012 IEP was in need of modification. Parents respond that the IDEA requires the District to revise an IEP as appropriate to address any lack of progress toward annual goals or any information provided by parents, citing 20 U.S.C. § 1414(d)(4)(A)(ii). Parent maintains that she sent a list of agenda items, and the District's failure consider them deprived her of a meaningful opportunity to participate in the formulation of Student's IEP.

During the November 2012 IEP formulation process, the team decided that an ESY determination would be considered by April 15, 2013. (Ex. S85 at 22.) On March 13, 2013, Ms. Shearer sent an email to Parent concerning the ESY IEP agenda and asked whether Parents had any issues for consideration. (Ex. S69.) Between March 13 and April 15, Parents and various District staff exchanged numerous emails concerning the ESY agenda and how ESY eligibility will be measured. (Exs. S70, S71, S76, S77.) Parents proposed twelve agenda items to discuss. (Ex. S73.)

Ms. Shearer responded that the April 15 meeting was not intended to be a full IEP review, but simply to discuss ESY and any other significant issues. On April 10, 2013, the District sent a Prior Written Notice denying Parents' request for a full IEP review. (Ex. S74.) The Notice provided that the meeting on April 15, 2013 was to "determine ESY and to consider any significant new information that has arisen since annual IEP since November." (Ex. S74.)

Parents and their attorney attended the April 15, 2013 meeting and presented a list of concerns for the team's consideration. (Ex. S79, S84 at 1-2.) At the meeting, the IEP team discussed Student's functional math skills, community life skills, speech and language goals. (Ex. S84 at 2-3.) The team also discussed that the work experience data showed regression, and that Student qualified for ESY work experience goals 2 and 3. (Ex. S84 at 3.) The IEP team noted that Student met her functional reading goal and a new goal would be drafted. (Ex. S84 at 3.) Parent inquired about how reading instruction was being delivered because Student no longer had a reading class. (Ex. S84 at 4.) The team also discussed assisting Student with transportation and working with Ride Wise. (Ex. S84 at 4-5.) Parent also expressed a desire to have Student receive academic reading and writing instruction in the next school year. (Ex. S84 at 5.)

On August 20, 2013, Parents sent an email to Ms. Shearer and Mr. Bafaro regarding issues that Parent raised at the April 14, 2013 meeting, including: lack of supporting documentation for ESY; focusing on competitive employment for Student; removal of the two paragraphs concerning Student's learning strategies; Parent's proposed ESY data for reading, writing, math, and SLP; spelling improvement; work experience to occur in a community setting; changing transition goals to academic college enrollment; checking the box for Student's behavior impeding the learning of others because of Student's health and safety and acting "psychotic"; adding social stories to the

accommodations page; and Parent's request to return Student to academic reading and writing from functional reading. (Ex. S88 at 1-2.) Parent sent numerous emails following up on issues raised at the April 15, 2013 meeting, to which the District responded. (Exs. S89-S96.) After reviewing data submitted by Parent at the meeting, on May 31, 2013, the District offered Student ESY in reading and speech/language, in addition to work experience. (Ex. S96.)

The court finds that ALJ Allen's decision erroneously concludes that the District failed to consider the regression and recoupment data presented by Parents. (Final Order at 30.) At the meeting, the District found Student ESY eligible in only the area of work experience. However, the record clearly shows that following the meeting, based on the District's consideration of Parents' documented data, the District offered ESY services to Student in the areas of reading and speech/language. Accordingly, to the extent ALJ Allen premised a procedural violation on the District's lack of consideration of Parents' regression and recoupment data, the ALJ's decision is reversed.

Moreover, the District's meeting minutes and audiotape confirm that Parents' concerns identified on the proposed agenda were considered. Parents and their attorney attended the meeting; the District responded to numerous emails on Parents' requested topics. While Parents may not have agreed with the answers they received, the District has persuasively demonstrated that Parents were not denied an opportunity to meaningfully participate in the April 15, 2013 IEP meeting. *Capistrano*, 556 F.3d at 909.

D.    *Compensatory Education as Counseling Was Not Substantive Violation*

As part of ALJ Messecar's remedies, the District was required to provide Student 60 minutes of counseling per week as compensatory education. In accordance with ALJ Messecar's decision,

on September 19, 2012, the District began providing Student counseling on Tuesdays from 8:45 to 9:45 a.m., which was later switched to 12:00 p.m. to 1:00 p.m. in January 2013. (Exs. S24, D10 at 1, 16.) Parents objected to the District providing compensatory education during Student's regularly scheduled academic day.

In the Final Order, ALJ Allen concluded that by scheduling Student's compensatory education in place of general or special education classes resulted in denial of FAPE. The ALJ concluded that by providing compensatory education during Student's regular day, Student was prevented from making progress in her other courses. "[T]he District's unorthodox provision of compensatory education denied Student a FAPE with regard to the course hours missed." (Final Order at 30.)

On appeal to this court, the District argues that ALJ Allen erred by failing to analyze any evidence from which to conclude that by providing the required compensatory education during school hours, the District interfered with Student's progress. Student offers no response.

As the District correctly highlights, this court reversed ALJ Messecar's decision that required it to provide 60 minutes of compensatory education in the form of counseling each week. *See Forest Grove*, 2014 WL 2592654, at *37 (noting that there was no evidence that extensive counseling was warranted). It would be improper to now penalize the District for abiding by ALJ Messecar's order.

Furthermore, the court concludes that ALJ Allen's findings of fact on this issue are neither thorough nor accurate, and thus are not entitled to deference. The ALJ cites no legal authority to support this particular conclusion. ALJ Allen's Final Order provides no discussion of what classes Student missed, how often, or what real, measurable impact Student's absence from either her

Tutorial class or Treble Choir once a week to attend her due process-ordered counseling had on her academic progress. Accordingly, the court reverses ALJ Allen's decision in this regard.

E.    Removal of Two Paragraphs in the November 2012 IEP

In the Final Order, ALJ Allen found that the District impermissibly removed information from the November 2012 IEP that pertained to Student's learning strategies. (Final Order at 27.) ALJ Allen found that Parents were denied a meaningful opportunity to participate in Student's education when the following two paragraphs that were previously contained in the November 2011 IEP were eliminated from the November 2012 IEP without prior written notice:

> Due to challenge that [Student] has processing auditory information; it is very helpful for information presented in all classes [to] be as visual as possible. Breaking down large assignments into smaller steps with due date for each step written on a calendar is also helpful.

> To help [Student] better understand reading materials in all classes, it is best to check for understanding often through a sequent of simple comprehension questions. Waiting until the end of a section of reading to check for understanding is too long.

(Final Order at 26; Ex, S9 at 8, Ex. S57 at 6.)[4] ALJ Allen determined that the District failed to provide a rationale as to why these learning strategies were removed without notice, and failed to reinsert them when requested to do so by Parents. The ALJ concluded that the District's "unilateral removal" of this information denied Parents a meaningful opportunity to participate in the IEP formulation and denied Student a FAPE. (Final Order at 27.)

Here, the District argues that Parents fully participated in the development and formulation of the November 2012 IEP. The District highlights that Parents and their attorney were provided

_____

[4] The court observes that these two "learning strategies" were discussed as "teaching techniques" in its prior Opinion and Order. *Forest Grove*, 2014 WL 2592654, at *24-26. In the Opinion and Order, the court determined that ALJ Messecar erred in requiring the District to adopt and include these teaching techniques in all of Student's classes. *Id.* at 26.

with a draft IEP prior the November 13, 2012 IEP team meeting, attended the meeting, and discussed Student's present levels – the portion of the IEP from which the two paragraphs were removed. (Tr. 459-60.) Additionally, the District asserts that Parents and their attorney were present at the continued November 27, 2012 IEP team meeting and did not raise an objection to the removal of the two paragraphs at that time and therefore, were not denied a meaningful opportunity to participate. (Tr. 461.)

Parents respond that they objected to the removal of the two paragraphs and requested that the paragraphs be reinserted soon after the November 27, 2012 team meeting. According to Parents, the District was obligated to inform them of the specific removal beforehand, and that after Parents objected, the District was required to issue a PWN for refusing to reinsert the two paragraphs into the IEP.

The court concludes that the ALJ's findings and conclusions on this point are not careful or thorough, and hold the District to an arbitrarily high standard. The ALJ cites no authority for the proposition that Parents, who are represented by counsel, need to be informed of each specific change to an IEP. *See M.A. v. Jersey City Bd. of Educ.*, 592 F. App'x 124, 129 (3d Cir. 2014) (holding that prior written notice adequately informed parents of action, and did not require specific description of the placement, such as specific classroom or school).

Here, the evidence before the court shows that prior to the November 2012 IEP meeting, Parents' attorney was provided with a draft IEP, and was informed that the draft would include changes to the present levels. (Ex. S48 at 1.) As the District correctly highlights, Parents and their attorney attended the November 13, 2012 IEP team meeting and acknowledged that they had an opportunity to review the draft IEP prior to the meeting. (Ex. S51 at 1-2.) Parents and their attorney

attended the second IEP team meeting on November 27, 2012, at which Student's present levels were again discussed. (Ex. S56 at 2.) At the hearing, Ms. Shearer explained that she drafted the November 2012 IEP, provided a copy to Parents and their attorney, and that Parents did not voice a concern or discuss the elimination of the two paragraphs from Student's present levels at either IEP team meeting. (Tr. 459-61.) At some point when preparing for the April 15, 2013 ESY team meeting, Parents raised a concern that the two paragraphs were eliminated from the November 2012 IEP. (Ex. S79.)

The ALJ did not cite any controlling legal authority requiring the District to notify Parents about the proposed amendment to eliminate Student's learning strategies, but instead appeared to rely upon ALJ Messecar's ruling. The District informed Parents' attorney that adjustments to present levels would be included in the draft IEP, and provided a draft IEP in advance of two meetings where those present levels were discussed. Although the court agrees that more granular information about specific changes can be helpful, such level of detail is not required under the regulatory scheme. *See* 20 U.S.C. § 1415(b)(3) (providing that PWN is required when educational agency proposes a change to "the identification, evaluation, or educational placement of the child"); 20 U.S.C. § 1415(c) (describing contents of PWN); OAR 581-015-2310 (providing PWN include a description of the action proposed).

Moreover, even if the District should have provided more specific notice that it was proposing to eliminate the particular learning strategies from Student's IEP present levels, that procedural violation did not result in denial of FAPE. *Target Range*, 960 F.2d at 1484 (holding that not all procedural inadequacies result in lost educational opportunities for the child or seriously infringe the parents opportunity to participate); *see also Jersey City*, 592 F. App'x at 129 (finding

that absent actual impairment to parental participation in educational decisions, deficient notice not actionable). As this court detailed in its earlier Opinion and Order concerning the November 2011 IEP, these two paragraphs were not required to be included in the November 2011 IEP in the first instance. *Forest Grove*, 2014 WL 2592654, at *26 (reversing ALJ's decision that requiring teachers to utilize "Larsen method" described in the two paragraphs to instruct Student).

Courts have repeatedly held that an IEP need not maximize a student's educational benefit. *Rowley*, 458 U.S. at 206-07; *Endrew*, 137 S. Ct. at 999 ("Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal.") As one court aptly described, the IDEA guarantees only "an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal citations and quotations omitted). The court will not penalize the District for removing the two paragraphs from the November 2012 IEP in this instance. Accordingly, the court concludes that the elimination of the two paragraphs identified above did not result in a denial of FAPE. The ALJ's decision in this regard is reversed.

Additionally, the court rejects Parents' contention that the District failed to issue a prior written notice addressing its refusal to add back the two paragraphs in the November 2012 IEP. As revealed in the emails surrounding the April 15, 2013 IEP team meeting, the meeting minutes, and meeting audiotape, Parents identified the elimination of the two paragraphs as an issue, along with numerous other topics it wanted to discuss at the April 2013 meeting. (Exs. S73, S79.) The District responded that not all of Parents' issues would be discussed at the meeting because the meeting was aimed at addressing ESY for summer 2013. (Exs. S73.) Parents requested and received a prior written notice about the District's refusal to hold a full IEP review to discuss all of their concerns

at the April 15, 2013 meeting. (Exs. S74, S77.) Accordingly, the court concludes that contrary to Parents' suggestion, the District did not commit a procedural violation in this instance.

F.    The District's Failure to Address Student's Behavioral Needs in November 2012 IEP Did Not Deny Parents Meaningful Opportunity to Participate

In the Final Order, ALJ Allen determined that the District refused to include information in the November 2012 IEP that Student's behavior impacted Student's and others' ability to learn. ALJ Allen concluded that the District's omission of information that Student is incapable of working without distracting self or others denied Parents the opportunity to participate in the IEP and denied Student a FAPE. In making this finding, ALJ Allen relied upon a Social Security Disability check-the-box Teacher Questionnaire completed by Ms. Taplin indicating that Student cannot work without distracting herself or others. (Final Order at 29, Ex. S72 at 9.) In the narrative portion of the questionnaire, Ms. Taplin provided that Student is "constantly distracted" by her desire to talk to instructional assistants and can only stay focused for ten seconds at a time. (Ex. S72 at 9.) ALJ Allen concluded that the District denied consideration of the exhibit when formulating the November 2012 IEP, and thus, denied Student a FAPE because it failed to appropriately address Student's behavioral issues. (Final Order at 29.)

The ALJ's Final Order is neither careful nor thorough on this point. The cases upon which ALJ Allen relies are not on point and provide no basis for concluding Ms. Taplin's questionnaire should be applied retrospectively to the November 2012 IEP. As the District correctly indicates, the Social Security Disability questionnaire completed by Ms. Taplin is dated April 18, 2013, and therefore, the questionnaire was not in existence at the time of the November 2012 IEP team meetings. The measure and adequacy of an IEP can be determined only as of the time it is offered to the Student, not at a later time. *See Anchorage*, 689 F.3d at 1047 ("We are mindful that we must

54 - OPINION AND ORDER

not critique an IEP with the benefit of hindsight – instead, we evaluate whether the goals and methods were reasonably calculated to ensure that the child would receive educational benefits at the time of implementation."); *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (recognizing that IEP's must be viewed as a snapshot, not a retrospective of what information was objectively known at the time the IEP was drafted); *Grants Pass*, 2015 WL 1951749, at 2 (same). Therefore, to the extent that ALJ Allen found the District's failure to consider Ms. Taplin's questionnaire at the time the November 2012 IEP was formulated, the decision is reversed.

To the extent that ALJ Allen determined that the November 2012 IEP failed to consider Student's underlying behavior described by Ms. Taplin and resulted in a substantive violation, the court again concludes that the ALJ's finding is neither careful nor thorough and is entitled to little deference for several reasons.

First, contrary to Student's argument, the record does not support ALJ Allen's conclusion that the District omitted "this information" from the November 2012 IEP over the Parent's objection. (Final Order at 29.) Ms. Taplin's April 8, 2013 questionnaire did not exist at the time the November 2012 IEP team meeting occurred. And, the record does not reveal any language similar to that described in Ms. Taplin's questionnaire requested by Parents relating to Student's disabilities impacting her ability to learn in the November 2012 IEP formation process. (Exs. S51, S52, S56.)

Second, to the extent that Parent requested information be included in the November 2012 IEP concerning Student's "behavior," it related to Student's anxiety and confusion, not inattentiveness or distractedness as reflected in Ms. Taplin's 2013 Social Security questionnaire. (Ex. S.51 at 3.) As the November 13, 2012 meeting minutes reflect, the IEP team discussed Student's "episodes at school" and whether they should be included in the IEP. (*Id.*) The team also

discussed Dr. Ensroth's report and recommendations and whether those issues should be contained in the present levels. (*Id.*) Again, at the November 27, 2012 IEP team meeting, Parent described Student as upset, and "psychotic," a description not endorsed by the remainder of the team. (Ex. S56 at 2.) The IEP team included Parent's description of about Student's behavior in the "current parent concerns" portion of Student's present levels portion of the IEP. (Ex. S56.) Contrary to ALJ Allen's conclusion, there simply is no evidence that Parents were denied an opportunity to participate in the formulation of the November 2012 IEP that is somehow connected to Ms. Taplin's April 2013 questionnaire answer. Thus, the ALJ's conclusion that Parents were denied an opportunity to meaningfully participate in the November 2012 IEP formation process concerning Student's "behavior" based on information in Ms. Taplin's questionnaire is reversed.

Third, in the April 2013 Social Security questionnaire, Ms. Taplin described that Student was distracted and needed to be redirected frequently. The court observes that this behavior is well documented and that Student was identified as IDEA eligible for ADHD beginning in 2005. (Ex. D1 at 1-4.); *see also Forest Grove*, 2014 WL 2592654, at *1 (discussing 2008 psychological report diagnosing student with ADHD). As noted in the March 28, 2011 evaluation by Amanda Morris, Psy.D., she recommended that Student's working environment be arranged to limit distractions, such as carefully choosing Student's classroom placement, and removing visual or auditory distractions. (Ex. D1 at 4.) The court observes that the November 2011 and November 2012 IEPs contain Ms. Morris's recommended work environment restrictions, including second row seating, a voice recorder, extended time to complete tests and assignments, alternate location, and copies of notes. (Exs. S9 at 2-4, S57 at 19-21.)

In Parents' First Amended Complaint in DP 13-104, they alleged that the District denied them the opportunity to "meaningfully participate in Student's education" by refusing to indicate that "Student's behavior impedes her leaning or the learning of others" at the April 15, 2013 meeting. (Answer, Ex. 1 at 9, ECF No. 3-1 at 9.) Having carefully reviewed the entire record, including the audiotape of the April 15, 2013 meeting, the court concludes that Ms. Taplin's Social Security teacher questionnaire was not presented at April 15, 2013 meeting. To the extent that ALJ concluded that the District failed to consider Ms. Taplin's questionnaire at the April 15, 2013 team meeting depriving Parents of the opportunity to meaningfully participate, the court reverses the ALJ's decision.

In summary, the court concludes, based on a preponderance of the evidence, that Ms. Taplin's April 2013 Social Security questionnaire answer – a wholly separate administrative process and purpose – should not be applied retrospectively to conclude that Student was denied a FAPE. The ALJ's decision on this point is reversed.

III.  Remedies

ALJ Allen ordered the District to provide Student a number remedies tied to ALJ Messecar's remedies order in DP 11-131, including that the District employ the "learning techniques" effective for Student, provide personnel training in IEP development and IEP evaluations. (Final Order at 32.) Additionally, based on the District's violations in DP 13-104, ALJ Allen ordered two remedies:

> The District shall convene an IEP team meeting facilitated by a neutral third party facilitator mutually selected by the parties within 21 calendar days of this issuance of this order. The District must provide sufficient time to address the concerns presented by Parent so long as those requirements pertain to Student's educational program.
>
> The District shall provide compensatory education, outside of Student's regular academic schedule, in the amount of two hours each of direct transitional math and

transitional reading instruction for every week of instruction Student should have received between December 7, 2011 and August 14, 2013.

(Final Order at 33.)

If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Courts have significant discretion in crafting remedies and may award compensatory education that aims at placing disabled children in the same position they would occupied but for the school district's violations. *Park ex rel. Park v. Anaheim Union Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006); *Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (Fed. Cir. 2005) (discussing court's discretion to fashion appropriate remedies under IDEA, including compensatory education).

This court reversed many of ALJ Messecar's findings and conclusions, and consequently, vacated all but one aspect of ALJ Messecar's ordered remedies. *Forest Grove*, 2014 WL 2592654 at *37-38. In that regard, the court vacated ALJ Messecar's remedies that Student's preferred "learning techniques" must be included in Student's IEP, that District personnel receive training on proper IDEA procedures and IEP development, and that the District provide compensatory instruction in transitional math and transitional reading instruction. *Id.* at 37. Accordingly, the court vacates ALJ Allen's remedies award premised on ALJ Messecar's decision that this court has previously vacated as inappropriate.

The court also vacates ALJ Allen's remedy that the ALJ convene an IEP team meeting as moot. According to the District, such a meeting already has occurred. The court also vacates ALJ Allen's award of compensatory transitional math and transitional reading instruction. In this action, the court did not find that the District's instruction in transitional math and reading was

inappropriate, therefore, ALJ Allen's award of compensatory instruction in those subjects is unwarranted.

As relevant to this case, this court affirmed ALJ Messecar's decision concerning Student's anxiety. *Forest Grove,* 2014 WL 2592654, at *35. The court determined that a remedy was warranted to with respect to Student's anxiety, but the existing evidence was conflicting and limited, and the court was unable to "craft an appropriate remedy." *Id.* at 38. Thus, the court ordered the District to provide Student "an independent anxiety evaluation," and after it was completed, to convene an IEP meeting and draft a new IEP that "appropriately addresses Student's anxiety." *Id.*

In the present action, the court affirmed ALJ Allen's determination that the District engaged in continuing violations from December 6, 2011 through the end of the academic year in June 2012 for failing to address Student's anxiety. The evidence before the court shows that the District began offering counseling for Student's anxiety on September 19, 2012 continuing through the period at issue. (Exs. D10, S41, S105.) Additionally, the record reveals that an educational evaluation of Student's anxiety occurred on October 2, 2012. (Ex. S38 at 1.) As discussed above, Dr. Arnold opined that her testing did not support a primary anxiety disorder. (*Id.* at 3.) Notably, in DP 13-104, Parents did not request any remedies with respect to Student's anxiety before ALJ Allen or in their briefing to this court. Therefore, the court finds that based on a preponderance of evidence, an award of remedies of any kind for the District's continuing violations due to its failure to address Student's anxiety is not appropriate, and is rendered moot by the District's previous remedial actions.

In summary, ALJ Allen's award of remedies is vacated.

*Conclusion*

Based on the foregoing, the court AFFIRMS in part and REVERSES in part the decision of ALJ Allen and concludes the following: (1) the District denied Parents' the opportunity to meaningfully participate in Student's education from December 6, 2011 to the end of academic year 2012 by continuing to rely on the faulty November 2011 IEP; and (2) the District denied Student a FAPE by failing to treat Student's anxiety and self-management from December 6, 2011 to the end of academic year 2012. The court rules in favor of the District on all remaining claims. An award of remedies is unwarranted and/or is moot.

IT IS SO ORDERED.

DATED this 27th day of NOVEMBER, 2018.

JOHN V. ACOSTA
United States Magistrate Judge